**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-314-DLB**

**GARRY L. EDMONDSON,** *in his individual*
*capacity as Kenton County Attorney*,                                          **PLAINTIFF**

vs.                              **MEMORANDUM OPINION AND ORDER**

**AZ PETITION PARTNERS, L.L.C., et al.**                          **DEFENDANTS**

\* \* \* \* \* \* \* \* \*

Plaintiff Garry L. Edmondson, Kenton County Attorney, commenced this civil action against Defendants AZ Petition Partners, L.L.C. ("Petition Partners"), Andrew D. Chavez ("Chavez"), managing member of Petition Partners, and "Unknown Defendants [that] are independent contractors paid by AZ Petition Partners" alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., ("RICO"), including fraud in connection with identification documents and information and mail fraud, related to the alleged forging of signatures on a petition filed with the Kenton County Clerk.  The Court's jurisdiction is premised on the federal question arising from Plaintiff's claims under RICO.

This matter is currently before the Court on Defendants Petition Partners and Chavez's (collectively "Defendants") Motion to Dismiss (Doc. # 6).  This motion has been fully briefed (Docs. # 7, 8), and is now ripe for review.  For the reasons stated herein, Defendants' Motion to Dismiss (Doc. # 6) is hereby **granted**.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petition Partners is an Arizona limited liability company engaged in the business of providing manpower resources for political activities, including gathering signatures in support of referendums and petitions in local and state elections, and signature processing and verification. Petition Partners pays independent contractors to solicit the requested signatures for a client's petition, such as the petition at issue here. After gathering the signatures, the independent contractors mail the documents to Petition Partners for their review, including processing and verification. Petition Partners then assembles and mails the petition documents back to the originating jurisdiction. The client is obligated to pay Petition Partners according to the total number of signatures produced.

In or around July 2011, proponents of a referendum to dissolve the Northern Kentucky Area Planning Commission ("NKAPC") engaged the assistance of Petition Partners in soliciting voter signatures necessary to submit a petition (the "NKAPC Petition") to initiate such dissolution as authorized by Kentucky statute.[1] "If the county clerk determines that the petition is in proper order, he shall certify the petition to the fiscal court," who shall then direct that the question be placed on the ballot at the next regular election. KRS § 147.620(4)©. The final NKAPC Petition contained the purported signatures of 24,299 voters, as well as each voter's first and last name and residential address. Of those signatures, 19,745 are attributable to the work of Petition Partners. Proponents of the

_____

[1] Kentucky Revised Statute § 147.620(4) sets forth a procedure by which an area planning commission may be dissolved by referendum. The first step instructs that "[p]ersons seeking dissolution of the commission shall submit a petition to the county clerk signed by at least twenty-five percent (25%) of the number of registered voters who voted in the last presidential election." KRS § 147.620(4)(a). The statute additionally sets forth the proper form for such a petition, and the time frame in which all signatures must be gathered. KRS § 147.620(4)(b).

NKAPC Petition paid five dollars ($5) per signature, resulting in a total receipt by Petition Partners of approximately $99,000.

On August 8, 2011, the NKAPC Petition was filed with the office of the Kenton County Clerk, Gabrielle Summe, by proponents of the Petition and Chavez.  The Kenton County Clerk and her staff reviewed the submitted documents to identify the individuals listed and verify their status as registered voters.   Upon review, the County Clerk determined that the NKAPC Petition contained the names of 4,292 individuals that could not be identified as registered Kenton County voters.  (This figure does not include the forged signatures of registered voters listed with their correct Kenton County residential address.)  The County Clerk verified that the petition contained forged signatures of registered voters residing in Kenton County, as well as forged signatures of individuals that maintain a professional office address in Kenton County but reside elsewhere.

In his complaint, Plaintiff alleges that the Unknown Defendant Independent Contractors working for Petition Partners copied a number of addresses found under the residential listing section of the 2010 *Kenton County Neighborhood Directory*, and then forged the signatures of the corresponding individuals.  As an example, Plaintiff has provided affidavits from Dr. John Jackson and Dr. Chris Thon, stating that their signatures were forged on the NKAPC Petition and that the corresponding residential address is in fact their respective professional addresses as listed in the *Kenton County Neighborhood Directory* published in 2010.  (*See* Docs. # 1-3, 1-4).

On September 6, 2011, The Kenton County Clerk announced that the NKAPC Petition was not in proper order and would therefore not be certified to the fiscal court. Proponents of the NKAPC Petition, including six individual Kenton County residents and

3

The Home Builders Association of Northern Kentucky ("HBA"), filed suit in state court against the County Clerk in her official capacity and the Kenton County Fiscal Court seeking declaratory and injunctive relief, alleging, *inter alia*, that "[p]ursuant to OAG 92-132, the signature of a voter on a local option petition may be rejected as invalid 'only if the clerk or the county judge/executive is unable to determine the petitioner's identity after consulting the information given on the petition,' and all signatures and entries are presumed to be valid." (Docs. # 1 at 6-7; 1-5 at 6); *see The Home Builders Assoc. of N. Ky., Inc. v. Gabrielle Summe*, No. 11-CI-2355, Kenton Circuit Court, Div. III (Second Amended Verified Complaint).   None of the named parties in the Kentucky state-court action are named parties in the instant action.

Plaintiff Edmondson has served as Kenton County Attorney since 1994.   With respect to the suit initiated by the NKAPC Petition proponents in state court, Plaintiff asserts that, due to "issues of fraud affecting the validity of the NKAPC Petition and the possibility of criminal proceedings initiated against culpable persons and entities," it was necessary to hire outside counsel to defend against allegations made in the state-court lawsuit "to avoid an appearance of bias and to avoid allegations of any conflict of interest." (Doc. # 1 at 7).   Absent the alleged issues of fraud surrounding the petition, Plaintiff states that he would have defended against the allegations in the Kentucky state court action himself, thereby eliminating the need to hire outside counsel and, in turn, eliminating the legal defense costs incurred in conjunction with that suit.

Plaintiff defines the damages at issue in his Complaint as the "legal defense costs incurred, and continuing to be incurred, to defend the County Clerk's conclusion that the NKAPC Petition is not in proper order."   (*Id.* at 8).   Plaintiff alleges that he has suffered

damages in his individual capacity because the possibility of a conflict required that he engage outside counsel to defend the County Clerk rather than perform those duties himself, the cost of which is being paid from his discretionary general fund. According to the Complaint, "any diminution of these funds constitutes a direct reduction in the resources available to provide . . . services" to the citizens of Kenton County and, therefore, "constitutes a real and immediate injury to the Plaintiff." (Doc. # 1 at 8).

On October 20, 2011, Plaintiff Edmondson, "in his individual capacity as Kenton County Attorney," commenced this civil RICO action pursuant to section 1962© alleging that Defendants are associated with an enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. Specifically, Plaintiff alleges that Petition Partners engaged in fraud in connection with identification documents and means of identification under 18 U.S.C. § 1028(a)(2), (3), and (7), and mail fraud under 18 U.S.C. § 1341, and that unknown independent-contractor solicitors engaged in fraud in connection with identification documents and means of identification under 18 U.S.C. § 1028(a)(1),(2),(3), and (7), and mail fraud under 18 U.S.C. § 1341. (Doc. # 1 at 8-18). The Complaint also alleges that Chavez engaged in a conspiracy with unknown independent contractors to violate section 1962© in violation of 18 U.S.C. § 1962(d). (*Id.* at 18-20).

Defendants AZ Petition Partners and Chavez have filed a Motion to Dismiss (Doc. # 6) pursuant to Federal Rule of Civil Procedure 12(b)(6). In their Motion, Defendants argue that Plaintiff Edmondson has failed to state a claim because Plaintiff: (1) lacks legal capacity; (2) is without standing; (3) has failed to allege a RICO "enterprise"; (4) has failed to allege valid racketeering activity; and (5) has failed to establish proximate causation. (*Id.*).

## II.  ANALYSIS

RICO provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964.  "'A violation of RICO under 18 U.S.C. § 1962© requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 888 n.7 (6th Cir. 2000) (quoting *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389 (6th Cir. 1996)).  "[R]acketeering activity" is defined to include a number of predicate acts, including those alleged in this case - fraud in connection with identification documents and information, and mail fraud.  *See* 18 U.S.C. § 1961(1).  Plaintiff alleges that he has suffered a real and immediate injury proximately caused by Defendants' alleged RICO predicate offenses in violation of section 1962.

Defendants advance several arguments in support of their Motion to Dismiss Plaintiff's Complaint.  However, as the Court finds that the Complaint should be dismissed because Plaintiff in his individual capacity lacks civil RICO standing, Defendants' remaining merits based objections need not be addressed.

### A.    Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a) "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and grounds upon which it rests.'"  *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In reviewing a Rule 12(b)(6) motion to dismiss, this Court "must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true.  When

6

an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (internal citation omitted). However, the principle that a court must accept as true all allegations contained in the complaint does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009).

To survive a motion to dismiss, the complaint "does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, but it must present "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. To satisfy this standard, the complaint must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 550 U.S. at 555. The "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* Furthermore, to survive a 12(b)(6) motion to dismiss, the complaint must "contain either direct or inferential allegations respecting all the material elements [of each claim] to sustain a recovery under some viable legal theory." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999)) (internal quotations omitted). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1999), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). A complaint will be insufficient if it tenders only "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 557. Accordingly, when a complaint merely contains legal conclusions, such are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. While legal conclusions may provide the framework of the complaint, if

7

unsupported by factual allegations dismissal is appropriate.

**B.    Legal Capacity**

Defendants initially argue that Plaintiff Edmondson, "In His Individual Capacity as Kenton County Attorney," lacks the requisite legal capacity to sue as this title is not a legally recognized person or entity. (Doc. # 6 at 4-5). They note that Plaintiff may sue either in his individual capacity (as Garry L. Edmondson, private citizen), or in his official capacity (as Kenton County Attorney), but there is no third option. (*Id.* at 5). Thus, Defendants contend, "the Complaint fails on the basis of its caption." (*Id.*).

Plaintiff clarifies this issue in his Response and confirms that the instant action was brought in his *individual* capacity, as stated in the Complaint. (Doc. # 7 at 2). Explaining why this suit was brought in his individual, rather than his official capacity, Plaintiff states that he seeks to recover damages to the Kenton County Attorney general fund, which he has a "personal interest in maintaining," and any recovery he receives in this action will be deposited into that account. (*Id.* at 2-3). The distinction between Plaintiff's personal and official roles appears to be the source of much confusion throughout the parties' written submissions. However, assuming that Plaintiff brings this suit in his individual capacity as Plaintiff suggests, he nevertheless lacks standing in that capacity to establish the civil RICO claims asserted herein.

**C.    Standing**

Defendants next contend that Plaintiff Edmondson, whether he brings this suit in his individual or his official capacity, lacks standing and the Complaint should therefore be dismissed. Having determined that Plaintiff only seeks to bring this action in his individual

capacity, the Court will only consider his standing to do so in that respect.  Section 1964©

provides a civil cause of action to "[a]ny person injured in his business or property by

reason of" a defendant's RICO violation.  18 U.S.C. § 1964©.  "RICO's civil-suit provision

imposes two distinct but overlapping limitations on claimants - standing and proximate

cause," both growing out of "the requirement that claimants establish that their injury was

'by reason of' a RICO predicate act violation".  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d

602, 612-13 (6th Cir. 2004).  The Sixth Circuit explained that the proximate cause inquiry

for RICO standing purposes "poses a threshold question involving constitutional, prudential

and . . . statutory limitations on who may sue, regardless of the merits of that person's

claim."[2]  *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 750-51 (1984)).  Defendants specifically

argue that Plaintiff lacks standing in his individual capacity because he has not suffered any

injury to his business or property as an individual, and because the damages alleged are

wholly derivative in nature and thereby fail to satisfy the directness requirement set forth

in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).

### 1.    Whether Plaintiff suffered an injury individually

Plaintiff's Complaint defines the damages as the "legal defense costs incurred, and

continuing to be incurred, to defend the County Clerk's conclusion that the NKAPC Petition

is not in proper order."  (Doc. # 1 at 8).  Defendants argue that Plaintiff in his individual

---

[2]  Traditional proximate cause, on the other hand, "poses a merits question involving common-law and prudential limitations on the consequences for which the law will hold a defendant accountable, regardless of the plaintiff's standing to sue."  *Trollinger*, 370 F.3d at 612 (citing *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  This inquiry  asks whether the causal link between the asserted injury and the alleged misconduct is "too weak to constitute proximate cause - because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes."  *Id.* at 614 (citing *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003)).

9

capacity lacks standing to bring this suit because the damages alleged, legal fees incurred in hiring outside counsel to defend the County Clerk, are tantamount to an injury to Kenton County, not Plaintiff individually.  (Doc. # 6 at 6).  In his Complaint, Plaintiff alleges that these defense costs are being paid by him in his individual capacity from the "county attorney discretionary general fund." (Doc. # 1 at 8).  Plaintiff contends that this general fund account is personal to Plaintiff, and thus he has standing to protect its depletion.  (*Id.*).

In support, Plaintiff cites *Kenton County Fiscal Court v. Elfers*, 981 S.W.2d 553 (Ky. Ct. App. 1998) in which the Kentucky Court of Appeals found that the Kenton County Attorney at that time, John Elfers, was entitled to specified contents of a "discretionary office expense fund," to be expended in any way he saw fit, including keeping the profits for himself.  The fund considered by the court in *Elfers* was created in response to a contract between Elfers and the Kentucky Cabinet for Human Resources, Department for Social Insurance, Division for Child Support Enforcement.  Through this contract, the Cabinet transferred the responsibility of supplying services to this division from the county fiscal court to Elfers personally, including responsibility for any related costs incurred.  The contract allowed for reimbursement of a portion of the expenses relating to the program activities as well as an incentive payment on all appropriate support collections.  *Elfers*, 981 S.W.2d at 555.  "In order to entice county attorneys to enroll in the program, and to assume liability for the . . . unreimbursed costs of the program[], the Cabinet encouraged and assisted county attorneys in getting their local fiscal courts to pass resolutions allowing the incentive payments received from the federal government to be paid directly to the county attorneys."  *Id.*  A Resolution of the Kenton County Fiscal Court provided that any and all payments made pursuant to that contract shall be received by the Kenton County Attorney

10

"for his use as a discretionary office expense fund."  *Id.* at 558.

The issue in *Elfers* was whether it was permissible for Elfers to expend those payments in any manner he chose, including keeping the profits for himself personally, rather than maintain them for his successor in office.  In determining that Elfers had control over the funds in his individual capacity, the court considered the fiscal court's Resolution to determine its intent and purpose for establishing the fund.  The court noted that no possible motives were suggested that would cause "Elfers to assume responsibility for child support collections if the intent of the fiscal court was to require that he maintain the funds for his successor to use," and found that the incentive payments were consistently treated "as belonging to Elfers to do with as he pleased."  *Id.* at 558-59.  The court also emphasized that the services performed by Elfers pursuant to the contract with the Cabinet were beyond those required of his position, and that he was personally responsible for any liabilities or costs associated with operating the program not covered by reimbursements. *Id.* at 559.

Plaintiff asserts that "Defendants' argument overlooks the significance of the court's decision in *Elfers*, which establishes that the county attorney is *personally* accountable if the office's general fund is insufficient to cover expenses incurred for providing services that are not required by statute."  (Doc. # 7 at 4).  Plaintiff states that he uses the contents of the general fund to provide legal and administrative services to the citizens of Kenton County that are not statutorily required of his position, and therefore any loss incurred in connection with providing such services would be a personal loss to Plaintiff.  (*Id.*).  Thus, he argues, "any depletion of [the general fund account] results in either reduced services that Plaintiff is able to provide or, alternatively, personal liability if a loss is incurred due to

diminution of the fund." (*Id.* at 5).

However, there are not enough facts before the Court to find conclusively whether an injury to the discretionary general fund constitutes harm to Plaintiff individually. Defendants argue that the general fund is "presumably funded by Kenton County," but the Complaint provides no basis by which the Court could draw such an inference at this stage. (Doc. # 8 at 2 n.1).  Plaintiff has not provided any information regarding the source of the funding for the general fund account at issue here, nor any statute or resolution creating this particular account.  In determining whether the funds in an account were personal or belonging to the office of the county attorney, the purpose and intent of the fiscal court in creating the fund were considered important factors by the court in *Elfers*, as well as the source and underlying purpose of the incoming funds.  The court did not simply assume that *any* discretionary general fund is personal to the county attorney in office.  However, the Complaint alleges that the specified funds affected are personal to Plaintiff in his individual capacity, and the holding in *Elfers* raises that possibility above the speculative level.  *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) ("We have held that '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  Therefore, as to the limited issue of whether Plaintiff has suffered any harm individually, the Complaint is sufficient to meet the pleadings standard.

### 2.  Whether the alleged injury is "derivative" in nature

Assuming that Plaintiff has in fact suffered an individual injury for RICO purposes,

12

Defendants argue that Plaintiff nevertheless lacks standing because the damages alleged are "derivative in nature" and therefore do not meet the "directness" requirement established by the Supreme Court in *Holmes.*  (Doc. # 6 at 6-8) (citing *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992)).  Specifically, Defendants assert that Plaintiff's allegations acknowledge that he "was not the target of Defendants' alleged racketeering activity, and that his alleged 'injury' instead arises as a consequence of certain obligations and responsibilities on his part triggered by harm directed toward third parties," namely the Kenton County Clerk and Kenton County voters.  (*Id.* at 6-7).

To establish RICO standing, "a plaintiff must plead and prove an actual injury to its business or property 'by reason of' a defendant's section 1962 transgression."  *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000).  The Supreme Court set forth the standard of causation necessary to afford standing in civil RICO claims in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).  The Supreme Court explained that the civil RICO provision requires the plaintiff to show that the defendant's predicate offense is not only a "but for" cause of his injury, but also the proximate cause.  *Holmes*, 503 U.S. at 267-68.  "Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations," *Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 989 (2010), and thus demands "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes*, 503 U.S. at 268; *see also Perry v. Am. Tobacco Co.*, 324 F.3d 845, 848 (6th Cir. 2003) (noting that "[i]n order to have standing to bring suit under RICO, a plaintiff must demonstrate proximate cause between the alleged injury and the defendant's injurious conduct," a "central element" of which is "the requirement of a direct injury").  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."

*Hemi Group*, 130 S. Ct. at 989 (citing *Holmes*, 503 U.S. at 271, 274).  Explaining this "directness" requirement, the Supreme Court reasoned that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts . . . generally . . . stand[s] at too remote a distance to recover." *Id.* at 268-69.

In *Holmes*, the Securities Investor Protection Corporation (SIPC) brought suit against Robert G. Holmes, Jr. under RICO alleging that he conspired in a stock-manipulation scheme which led to the insolvency of two broker-dealers.  *Holmes*, 503 U.S. at 261-62. As a result of their insolvency, the broker-dealers were unable to satisfy their financial obligations to their customers (who did not themselves purchase any manipulated securities), triggering SIPC's statutory duty to advance funds to cover the customers' claims.  *Id.*  The Court found that SIPC lacked standing to sue under RICO because they were injured only indirectly by the alleged RICO violation.  *Id.* at 272-74.  The Court stated that, even assuming *arguendo* that SIPC may stand in the shoes of the non-purchasing customers, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.  Stated another way, "the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.*

Three administrative justifications were provided by the *Holmes* Court for RICO's direct injury requirement. *Holmes*, 503 U.S. at 268-270 (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519 (1983) (providing reasons that "directness of relationship" has been a central element of Clayton Act causation)).  "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages

14

attributable to the violation, as distinct from other, independent, factors." *Id.* at 269. On the facts presented in *Holmes*, "the district court would first need to determine the extent to which [the nonpurchasing customers'] inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." *Id.* at 273. Second, courts would be forced "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* at 269. In *Holmes*, the Court noted that the district court would be tasked with apportioning the possible respective recoveries by the broker-dealers and the customers. *Id.* at 273. Finally, the Court stated that such injurious conduct might be deterred without grappling with such difficult issues "since directly injured victims can generally be counted on to vindicate the law as private attorneys general." *Id.* at 269. Those directly injured in that case, the broker-dealers, could have brought suit against Holmes, and did in fact sue him. *Id.* at 273-74. Thus, the Court did not hold that RICO could not serve to right the wrongs alleged, but rather held "merely that the nonpurchasing customers, or SIPC in their stead, are not proper plaintiffs." *Id.* at 274.

The Supreme Court again addressed the direct injury requirement of civil RICO actions in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), applying the principles set forth in *Holmes*. In *Anza*, Ideal Steel Supply Corporation filed suit alleging that its principal competitor, National Steel Supply, Inc., was engaged in an unlawful racketeering scheme "aimed at 'gain[ing] sales and market share at Ideal's expense.'" *Anza*, 547 U.S. at 453-54. Ideal explained that this goal was accomplished through National's practice of failing to charge New York state sales tax to cash-paying customers, which allowed

National to offer lower prices and thereby gain a competitive advantage. *Id.* To conceal this unlawful conduct, National allegedly submitted fraudulent tax returns to the New York State Department of Taxation and Finance. *Id.* The Court found that the direct victim of National's alleged fraud was the State of New York, not Ideal. *Id.* at 458. The cause of Ideal's asserted harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* Noting that "[t]he attenuation between the plaintiff's harms and the claimed RICO violation arises from a different source in this case than in *Holmes*, where the alleged violations were linked to the asserted harms only through the broker-dealers' inability to meet their financial obligations," the Court nevertheless found that "the absence of proximate causation is equally clear in both cases." *Id.* The Court held that plaintiff Ideal Steel's claim did not satisfy the requirement of proximate cause, and stated that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.* at 460. Accordingly, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461.

Plaintiff Edmondson contends that an injury need not be directly caused by Defendants' RICO misconduct to provide standing to bring a civil RICO claim under section 1964©. In support, Plaintiff cites *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) for the proposition that "'RICO is to be read broadly' to permit recovery for direct, and indirect, damages which flow from the commission of predicate acts.'" (Doc. # 7 at 5) (quoting *Henry & Wright Corp. v. Automatic Press Corp.*, 924 F.2d 1058 (6th Cir. 1991) (unpublished table decision)). Moreover, Plaintiff contends, the Supreme Court concluded in *National*

*Organization for Women v. Scheidler*, 510 U.S. 249 (1994) that the plaintiff's allegations

that the RICO conspiracy "'ha[d] injured the [plaintiffs'] business and/or property interests'"

was sufficient to confer standing at the pleading stage.  (Doc. # 5 at 6) (citing *Scheidler*,

510 U.S. at 256).   Unfortunately for Plaintiff, the "broad" reading he urges to permit

standing to parties who have been only *indirectly* injured by the alleged RICO violations is

not supported by the relevant case law.

Plaintiff's interpretation of the impact of *Sedima* is misguided.  In *Sedima*, the

Supreme Court was not addressing the "direct injury" requirement dictated by the language

of the RICO statute; rather, it was addressing an additional standing requirement imposed

by the Second Circuit regarding the *type* of injury suffered - "that the plaintiff must seek

redress for an injury *caused by conduct that RICO was designed to deter.*"  473 U.S. at 494

(emphasis added).  The Court emphasized that "Congress wanted to reach both 'legitimate'

and 'illegitimate' enterprises," and refused to adopt a narrow and restrictive reading not

demanded by the text of RICO that "respected businesses allegedly engaged in a pattern

of specifically identified criminal conduct" are beyond its scope.  *Id.* at 497-99.  Moreover,

the direct injury requirement of civil RICO standing was clarified and addressed at length

in the Supreme Court's subsequent decisions in *Holmes* and *Anza*, as detailed herein.

Refusing to interpret RICO to permit claims of only-indirectly-injured plaintiffs, the Supreme

Court in *Holmes* stated that even "the very unlikelihood that Congress meant to allow all

factually injured plaintiffs to recover persuades us that RICO should not get such an

expansive reading."  *Holmes*, 503 U.S. at 265-66 (finding that recovery under section 1962

requires a plaintiff to do more than merely demonstrate that "the defendant violated § 1962,

the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's

injury"); *see also Anza*, 547 U.S. at 456 (citing *Holmes*, 503 U.S. at 265-66) (stating that the *Holmes* Court "recognized the phrase 'by reason of' could be read broadly to require merely that the claimed violation was a 'but for' cause of the plaintiff's injury [but] rejected this reading").

Furthermore, the Sixth Circuit addressed a similar argument in *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003) in which it "reject[ed] Plaintiffs' claim that standing to bring a RICO claim is not always limited to parties who are directly injured." *Id.* at 849. The plaintiffs in that case argued that the district court had failed to consider the Supreme Court's decision in *Scheidler* granting RICO standing to abortion clinics. *Id.* at 849-50. The Sixth Circuit rejected this claim, holding that *Sheidler* was "inapposite . . . since the Supreme Court did not address the direct injury requirement that is at issue in the present case." *Id.* at 850 (citing *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704 n.4 (9th Cir. 2001) for the proposition that "*Scheidler* concerns constitutional, rather than RICO or antitrust, standing). Finding that the plaintiffs' claims were not only contingent upon harm to a third party, but upon other intervening actions as well, the court in *Perry* ultimately held that the plaintiffs lacked standing because their alleged injuries were too remote. *Id.* at 848-49.

The individual harm Plaintiff asserts herein was not directly caused by Defendants' alleged RICO misconduct, and thus does not meet direct relationship requirement of civil RICO standing. The factual allegations in the Complaint demonstrate that the relationship between Plaintiff's asserted harm and Defendants' alleged RICO misconduct bears discontinuity of the types found in both *Holmes* and *Anza*: Plaintiff's asserted injury here is the result of actions separate from the alleged RICO predicate offenses, and the

asserted injury is wholly derivative of harm to third parties.  Plaintiff alleges that Defendants engaged in a pattern of racketeering activity in a "scheme to defraud the Clerk and voters" consisting of forging signatures and accompanying information on the NKAPC Petition which was filed with the County Clerk, and using the mail to send the allegedly fraudulent documents to one another.  As a result of this scheme, the Complaint alleges damages in the form of "legal defense costs incurred, and continuing to be incurred, to defend the County Clerk's conclusion that the NKAPC Petition is not in proper order."  (Doc. # 1 at 8). Plaintiff argues that he has been injured in his individual capacity because these defense costs are being paid from his county attorney discretionary general fund.  Because this fund is used to provide legal and administrative services to the citizens of Kenton County, "any diminution of these funds constitutes a direct reduction in the resources available to provide the same quality of services and, therefore, constitutes a real and immediate injury to the Plaintiff."  (*Id.*).

As an initial matter, Defendants' alleged RICO violations did not lead directly to Plaintiff's asserted injury because the asserted harm is the result of actions separate and distinct from the alleged RICO misconduct.  Plaintiff's need "to defend the County Clerk's conclusion that the NKAPC Petition is not in proper order" arises only because of the state-court lawsuit.  This suit was initiated by proponents of the NKAPC Petition, an action separate and distinct from Defendants' alleged racketeering activity of filing forged documents and transferring them through the mail.  The disconnect between the asserted injury and the alleged fraud in this case is even more clear than that in *Anza*, where the same party - the defendant, National Steel - had engaged in both the allegedly injurious conduct of lowering prices and committed the fraudulent act.  547 U.S. at 458.  Here, the

damages alleged by Plaintiff are a result of the state-court lawsuit, a separate action carried out by separate parties.

This disconnect in the causal chain between the alleged RICO violation and the asserted injury gives rise to one of the "fundamental concerns expressed in *Holmes*."[3] *Anza*, 547 U.S. 459.  A consideration highlighted by the Supreme Court in *Holmes* was the recognition that when a plaintiff is injured only indirectly, it is more difficult "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."   *Holmes*, 503 U.S. at 269.   Plaintiff contends that these considerations "do not weigh in favor of dismissal" because the injury to the discretionary general fund is equal to the legal defense costs, which are "easily quantifiable," and thus are "neither speculative nor subject to apportionment."  (Doc. # 7 at 15-16).  Although the legal defense costs, and the resulting diminution to the general fund, is likely quantifiable, it is unclear as to what extent that diminution is attributable to Defendants' alleged fraud. More specifically, it is unclear to what extent the lawsuit against the County Clerk, and thus the need to provide a defense, is the product of other independent factors.

In the state-court complaint attached to Plaintiff's Complaint,[4] the HBA stated that

---

[3]  Although these considerations are useful tools and "help to illustrate why [a plaintiff's] injury [is] not the direct result of a RICO violation," they need not all be implicated by the particular facts of each case.  *Anza*, 547 U.S. at 459 (finding that plaintiff lacked standing under RICO "[n]otwithstanding the lack of any appreciable risk of duplicative recoveries, which is another consideration relevant to the proximate-cause inquiry").

[4]  "Federal Rule of Civil Procedure 10© provides that '[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.'"  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *see also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990) (In reviewing a Rule 12(b)(6) motion, "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.").

during the Kenton County Clerk's process of assessing the NKAPC Petition's validity, the HBA advised her "of their concerns that the program that she was using to search the database of Kenton County voters was leading to the exclusion of registered voters." (Doc. # 1-5 at 5). The HBA further stated that it recommended additional resources to lessen this risk of error, but those resources were not utilized by the Clerk. (*Id.*). The state-court complaint requests, *inter alia*, declaratory judgment as to whether the Clerk "used a reasonable process to carry out her duties, and whether her certification process was consistent with Kentucky law." (*Id.* at 6). Individual plaintiffs in that action also allege that they have suffered harm as their signatures were wrongfully excluded from the Petition. (*Id.* at 7). Regardless of the outcome of that litigation, it is clear that other, independent factors may have played a role in the initiation of the state-court suit, including the certification process chosen by the County Clerk and the ultimate accuracy of her assessment. *See Anza*, 547 U.S. at 458 ("National . . . could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud."); *Holmes*, 503 U.S. at 271-73 (noting that the plaintiff's asserted injury was only connected to the conspirators' alleged RICO predicate acts through the broker-dealers' intervening insolvency, which may have been a product, at least in part, of other contributing factors such as "the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets"). Likewise, the fact that a fraudulent petition is filed with the County Clerk does not necessarily mean that a lawsuit against the Clerk will arise from her determination that the petition was not in proper order; assuming the Clerk makes the same determination, proponents of the Petition could have simply accepted the determination or attempted to create a new, valid petition rather than sue. *See Anza*, 547 U.S. 459 ("[T]he fact that a

21

company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.").

Furthermore, even the lawsuit against the County Clerk alone did not *directly* result in the damages Plaintiff alleges.  An actual injury occurred only as a result of Plaintiff's own subsequent decision to hire outside counsel.  In the Complaint, Plaintiff states that he "decided that it would be best to hire outside counsel to address the civil issues affecting the validity of the certification process and to defend the Clerk."  (Doc. # 1 at 7).  He further acknowledges in the Complaint that, but for this choice, "Plaintiff would have defended against the allegations made in the civil suit without the need to hire outside counsel and without the need to incur defense costs."  (*Id.*).  Plaintiff asserts that Defendants' allegedly fraudulent acts gave rise to a need for outside counsel to defend the Clerk "so as to avoid issues of perceived conflict or bias due to Plaintiff's concurrent duties and responsibilities as a prosecutor."  (*Id.*).  However, standing for civil RICO purposes requires more than an attenuated causal chain alleging that the asserted harm is an eventual "but for" consequence of the RICO predicate offenses; it requires a *direct relationship* between the predicate offenses and the asserted harm.  *See Holmes*, 503 U.S. at 267-68.  The harm asserted here is the result of separate, distinct actions, including actions taken by the Plaintiff himself.  Thus, as in *Anza*, the conduct directly causing the asserted injury was distinct from the Defendants' conduct giving rise to the alleged fraud.  *See also Hemi Group, LLC v. City of New York, NY*, 130 S. Ct. 983, 990 (2010) (refusing to "extend RICO liability to situations where the defendant's fraud on the third party . . . has made it easier for a *fourth* party . . . to cause harm to the plaintiff").

Additionally, as in *Holmes*, the injury Plaintiff alleges to have suffered in his individual capacity is wholly derivative of harm visited upon third parties. When considering a motion to dismiss, "a court often finds no need to look beyond the face of the complaint in order to determine that the plaintiff lacks standing because the injury was passed on by another party that had a more direct relationship with the defendant." *Trollinger*, 370 F.3d at 615. In *Trollinger*, the Sixth Circuit found that the plaintiffs had civil RICO standing, noting that the direct employment relationship between the parties distinguished that "dispute from the *Holmes* line of cases, where the plaintiffs had no relationship with the defendants except through intermediaries."[5]  370 F.3d at 616. This case is illustrative of such an attenuated relationship. Plaintiff's only connection to the Defendants or their alleged RICO offenses is through intermediate parties.

Defendants' alleged RICO predicate acts include forging of voters' signatures and accompanying personal information on the NKAPC Petition filed with the County Clerk and transferring those documents to one another through the mail. The damages alleged here arise from the state court lawsuit brought against the Kenton County Clerk by proponents of the NKAPC Petition, ultimately resulting in costs "to defend the County Clerk's conclusion that the NKAPC Petition is not in proper order." (Doc. # 1 at 8). Although Plaintiff asserts in his Complaint that he is paying these defense costs in his individual capacity, he additionally alleges that the Defendants' RICO predicate acts of fraud targeted

---

[5] In citation, the *Trollinger* Court provided the following list: *Holmes*, 503 U.S. at 270-74, 112 S.Ct. 1311 (SIPC - customers - brokers - tortfeasor); *Perry*, 324 F.3d at 849 (policy holders - insurance company - smokers - tortfeasor); *Pik-Coal Co.*, 200 F.3d at 890-91 (coal broker - coal company - tortfeasor); *Firestone*, 976 F.2d at 285 (beneficiaries - estate - tortfeasors); *Sanders Confectionery Prods., Inc.* [*v. Heller Fin.*, 973 F.2d 474] 487 [(6th Cir. 1992)] (stockholder - corporation - tortfeasor). *Trollinger*, 370 F.3d at 616.

the County Clerk and the voters, and that the County Clerk, not the Plaintiff, was the named defendant in the subsequent state court action.  (*Id.* at 7-8) (confirming that "[n]one of the named parties in [the state court] case are named parties in the herein action").  Defendants argue that the allegations made in the Complaint thus place Plaintiff's injury "squarely within [the] category of 'derivative or passed-on injuries' so expressly foreclosed to civil RICO plaintiffs by *Holmes* and its progeny."  (Doc. # 6 at 8) (quoting *Trollinger*, 370 F.3d at 614).

In his Response, Plaintiff emphasizes his statutory obligation to defend the County Clerk in civil litigation to support his argument that legal costs incurred by the County Clerk in her official capacity are actually direct costs to Plaintiff.[6]  (Doc. # 7 at 16).  However, even assuming that Plaintiff in his official capacity as Kenton County Attorney could be said to "stand in the shoes" of the County Clerk by reason of his statutory duty to provide a defense, *Holmes*, 503 U.S. at 271, the instant action was not brought by Plaintiff in his official capacity.  Plaintiff reiterates throughout his Complaint and his Response that this action was brought in his "individual capacity."  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6 (1986) ("Acts performed by the same person in two different capacities 'are generally treated as the transactions of two different legal personages.'") (quoting F. James & G. Hazard, Civil Procedure § 11.6, p.594 (3d ed. 1985)).

---

[6] Plaintiff additionally implies that he is obligated to provide a defense to the County Clerk in his Complaint.  He alleges that absent any issues of fraud, "Plaintiff would have defended against the allegations made in the civil suit without the need to hire outside counsel and without the need to incur defense costs."  (Doc. # 1 at 7).  Hiring outside counsel, Plaintiff asserts, would "avoid issues of perceived conflict or bias due to Plaintiff's concurrent duties and responsibilities as a prosecutor."  (*Id.*).  Plaintiff's reference to his "concurrent duties" as a prosecutor and, presumably, a defender highlights the presence of this obligation.

The Complaint further explains that "a real and immediate injury to Plaintiff" was sustained because the payment of the legal defense costs results in a diminution to the discretionary general fund, which, in turn, "constitutes a direct reduction in the resources available to provide the same quality of services" to the citizens of Kenton County.  (Doc. # 1 at 8).  Plaintiff clarifies in his Response that "if there is a loss incurred in connection with providing these services, it would be *personal* to Plaintiff."  (Doc. # 7 at 4).  Assuming, as the Court must at this stage, that a reduction in these resources is an injury to Plaintiff personally, this injury still fails to satisfy the "directness" requirement necessary to state a civil RICO claim.  The diminution in funds available to provide additional services to Kenton County citizens merely demonstrates a harm that is *derivative* of the legal defense costs incurred by Kenton County and/or certain Kenton County officials.  The Supreme Court and the Sixth Circuit have applied the civil RICO standing requirements set forth in *Holmes* across a broad spectrum of factually diverse cases.  Regardless of the underlying factual context, a plaintiff who has been injured only indirectly does not have standing to bring a civil RICO action, even where the plaintiff has suffered a clear economic harm.  *See, e.g.*, *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (finding that plaintiff beneficiaries of an estate "employ[ed] flawed logic in their insistence that an 'actual monetary loss' equates to a 'direct injury'" where the asserted injury of diminution of their inheritance caused by fraud against their grandmother during her lifetime was held to be derivative of the harm suffered by the estate, and therefore insufficient to meet the civil RICO standing requirements).

As the Supreme Court recognized in *Holmes*, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step."  503 U.S. at 271-72 (quoting

*Associated Gen. Contractors*, 459 U.S. at 534).  Cases from the Supreme Court as well as the Sixth Circuit confirm that this "'general tendency' applies with full force to proximate cause inquiries under RICO."  *Hemi Group*, 130 S. Ct. at 989; *see also Holmes*, 503 U.S. at 271-72; *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 657-58 (2008); *Anza*, 547 U.S. at 460-61; *Trollinger*, 370 F.3d at 613-14.  According to the allegations set forth in the Complaint, multiple steps, and actions by multiple parties, separate the alleged fraudulent RICO acts from the asserted injury.  Plaintiff's theory of causation here requires the Court to reach well beyond the first step, and thus cannot meet RICO's direct relationship requirement.  *See id.*

Accepting all facts as stated in Plaintiff's Complaint as true, Plaintiff in his individual capacity has been harmed only indirectly, if at all, by Defendants' alleged RICO violations.  Any injury to Plaintiff individually merely flows from harm visited upon third parties and is the result of separate actions, including his own, and thus, Plaintiff stands at too remote a distance to recover.   As the Court finds that Plaintiff lacks standing under RICO, Defendants' remaining objections to the merits of Plaintiff's claims need not be addressed.

### III.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

1.      Defendants AZ Petition Partners, L.L.C. and Andrew Chavez's Motion to Dismiss (Doc. # 6) is hereby **GRANTED**[7];

---

[7]  Although the Motion to Dismiss was not brought on behalf of the Unknown Defendants that are independent contractors paid by AZ Petition Partners, because Plaintiff lacks RICO standing, his claims against those Unknown Defendants also fail.

2.      Plaintiff's claims brought pursuant to 18 U.S.C. § 1961 et seq. are hereby

**DISMISSED WITH PREJUDICE**;

3.      The Motion to Withdraw as Counsel for Defendants (Doc. # 11) is hereby

**DENIED as MOOT**;

4.      This case is hereby **STRICKEN** from the active docket of the Court; and

5.      This is a **FINAL** and **APPEALABLE** Order.

This 22nd day of August, 2012.

Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\Covington\2011\11-314 MOO Granting MTD.wpd